HAGENS BERMAN SOBOL SHAPIRO LLP
Reed R. Kathrein (Bar. No. 139304)
reed@hbsslaw.com
Lucas E. Gilmore (Bar No. 250893)
lucasg@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

*Liaison Counsel for Plaintiff*

LABATON KELLER SUCHAROW LLP
Francis P. McConville (*pro hac vice* forthcoming)
fmcconville@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE TRADE DESK, INC., JEFFREY T. GREEN, LAURA SCHENKEIN, and SAMANTHA JACOBSON,<br>Defendants. | Case No.  2:25-cv-01936<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff New England Teamsters Pension Fund ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning

Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (1) The Trade Desk, Inc.'s ("Trade Desk" or the "Company") regulatory filings with the U.S. Securities and Exchange Commission ("SEC"); (2) press releases and media reports issued and disseminated by the Company; (3) analyst and media reports concerning the Company; and (4) other public information regarding the Company, including statements made by Trade Desk executives. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired Trade Desk Class A common stock between May 9, 2024 and February 12, 2025, inclusive (the "Class Period"). The claims asserted herein are alleged against Trade Desk, its Chief Executive Officer, Jeffrey T. Green ("Defendant Green"), its Chief Financial Officer, Laura Schenkein ("Defendant Schenkein"), and its Chief Strategy Officer, Samantha Jacobson ("Defendant Jacobson") (collectively, the "Defendants"), arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Trade Desk is a Ventura, California-based technology company that operates a cloud-based digital platform that helps advertisers place ads on websites, podcasts, and streaming services. The Company was founded in 2009 and completed its initial public offering ("IPO") in September 2016. From its IPO to the end of the Class Period, Trade Desk consistently reported increasing yearly revenues and repeatedly hit projected sales guidance targets.

3.      On June 6, 2023, approximately one year before the start of the Class Period, Trade Desk introduced Kokai, its new and enhanced media buying and analytics demand-side platform ("DSP"), an intermediary facilitating the placement

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of advertisements between advertisers (the demand side) and publishers (the supply side). Trade Desk described Kokai as the "most advanced product launch" in the Company's history, following previous platform rollouts NextWave in 2018 and Solimar in 2021. Kokai purports to allow clients to use artificial intelligence ("AI") to process 15 million advertising opportunities per second and deploy data about their most loyal customers as a "seed" to grow and target new audiences.

4.     As the Company began transitioning its clients from its older advertising platform Solimar to Kokai, Trade Desk assured investors that it expected "full adoption" of Kokai by existing Trade Desk customers "over the course of 2024." Defendants also told investors after the June 2023 launch of Kokai, it "would take about a year to roll out in its entirety."

5.     Defendants touted Kokai as a "large growth driver" and claimed that Kokai would have a positive impact on Trade Desk's revenue metrics. For example, in May 2024, Defendant Green publicly stated, "I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we are delivering to our clients with Kokai." Similarly, in August 2024, Defendant Green publicly stated, "I've been incredibly encouraged by the early results from Kokai" showing that "incremental reach is up more than 70%, cost per acquisition has improved by about 27%, and data elements per impression have gone up by about 30%."

6.     Defendants also underplayed the growing competitive threats to Kokai from Amazon DSP and other platforms. Defendants emphasized Trade Desk's independence as a key differentiator in contrast to Amazon's "objectivity problem" that had potential conflicts of interest with retailers and advertisers. For example, in discussing the competitive threat from Amazon, Defendant Green stated that, "I actually don't think they're that competitive." When asked about what allowed Trade Desk to overperform its competitors during an earnings call on August 8, 2024, Defendant Green responded: "I don't know that I have ever been more proud of our

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

team across the board, not just in our go-to-market teams, but of course, our engineering team, and throughout the entire company [and] I don't know that we've ever been firing on all cylinders in the way that we are right now."

7.      These statements, among others, were materially false and misleading and/or failed to disclose material adverse facts about Trade Desk's business, operations, and prospects.  Specifically, Defendants failed to disclose that: (i) Trade Desk was experiencing significant performance issues with the Kokai platform that were negatively impacting customer adoption; (ii) Trade Desk was deliberately slowing the pace of its Kokai rollout to maximize short-term profits; (iii) competition from Amazon and other competing platforms was taking substantial market share away from Trade Desk; (iv) Trade Desk's engineering and sales teams were not adequately structured to support the Kokai rollout and fend off mounting competition; and (v) as a result of the forgoing, Defendants' positive statements about its business, operations, and prospects were materially false and misleading and/or lacked reasonable basis at all relevant times.

8.      The truth about the Company's unsuccessful Kokai rollout and its loss of market share to competing platforms was revealed to the market on February 12, 2025.  On that date, Trade Desk disclosed that its fourth quarter 2024 revenue missed analysts' forecasts due to a series of execution missteps with the Kokai rollout that prompted a major corporate restructuring.  During the earnings call held that same day, Defendant Green explained that "Kokai rolled out slower than we anticipated" and "in some cases, the slower Kokai rollout was deliberate" because "a quicker rollout would result in more short-term spend."  Defendant Green also stated that "We are recalibrating our larger company for an even stronger future," including with "the largest reorganization in company history in December."

9.      Analyst were not only surprised by the failed Kokai rollout, but they also concerned about Trade Desk's competitive landscape.  For example, analysts at RBC Capital Markets noted that a "series of small execution missteps" contributed to the

shortfall in expectations, and that "results likely build on investor competitive concerns." Similarly, analysts at Wedbush Securities noted that "the underperformance in the quarter amplifies a number of recent debates, including the strength of the company's competitive position."

10.    On this news, Trade Desk's stock price fell $40.31 per share, or *33 percent*, to close at $81.92 per share on February 13, 2025.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).    Trade Desk is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

16.    Plaintiff, as set forth in the attached Certification, acquired Trade Desk common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Trade Desk was a Delaware corporation with principal executive offices located at 42 N. Chestnut Street in Ventura, California.   On November 15, 2024, Trade Desk filed a certificate of conversion with the State of Delaware and articles of conversion with the State of Nevada after reincorporation was approved by the Company's stockholders at a special meeting held the day before. Trade Desk's Class A common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "TTD."   As of January 31, 2025, 452,425,879 shares of Trade Desk's Class A common stock were outstanding, owned by thousands of investors.

18.     Defendant Green has served as Trade Desk's Chairman of the Company's Board of Directors ("BOD"), President, and Chief Executive Officer at all relevant times.  Defendant Green is also the Company's co-founder.

19.     Defendant Schenkein has served as Trade Desk's Chief Financial Officer at all relevant times.

20.     Defendant Jacobson has served as a Director on the Company's BOD and Trade Desk's Chief Strategy Officer at all relevant times.

21.     Defendant Green, Defendant Schenkein, and Defendant Jacobson are collectively referred to herein as the "Individual Defendants."   The Individual Defendants, because of their positions with Trade Desk, possessed the power and authority to control the contents of Trade Desk's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were

then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.    Trade Desk is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

23.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Trade Desk under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Founded in 2009, Trade Desk specializes in programmatic advertising through a self-service, cloud-based platform. The Trade Desk platform allows advertising buyers to create, manage, optimize, and measure data-driven digital advertising campaigns across various formats and channels, including video, audio, digital-out-of-home, and social media. Users can select target audiences, build custom audiences by uploading first-party data, upload creative content, and choose where to activate campaigns by selecting from various inventory options.

25.    Trade Desk employs a stock market-like programmatic auction system to compete for advertising impressions in real-time. Programmatic buying through Trade Desk involves placing bids on available inventory through this auction process, as opposed to buying directly from publishers like Disney and *The New York Times*, allowing buyers to participate in advertising auctions in the short time it takes for a digital advertisement to load. Users can set maximum and minimum bids, providing a bracket for the algorithm to work within, rather than a fixed bidding amount. The Company's primary focus is on automating the workflow of "pitch to pay" for end

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

users, particularly agency holding companies, enabling them to execute integrated campaigns with millions of impressions across multiple channels and devices.

26.    Trade Desk generates revenue by charging clients a fixed platform fee based on a percentage of their total advertising spend on the platform for self-service use of their platform, where clients handle campaign setup and execution themselves. The platform also offers advanced features such as the ability to dynamically trade on different exchanges for the same publisher, potentially allowing users to secure better pricing. For managed service campaigns, where Trade Desk handles trading and setup, an incremental fee is charged on top of the platform fee. Additionally, Trade Desk's "fee features," which allow for customization and optimization of advertising campaigns, are a key revenue driver and generate significant margins for the Company.

27.    Trade Desk introduced NextWave in 2018 and Solimar in 2021. On June 6, 2023, Trade Desk launched Kokai, the successor to the Solimar platform. According to Trade Desk, Kokai allows clients to deploy data about their most loyal customers and use it as a seed to grow and target new audiences across thousands of destinations on the open internet, leveraging AI to process millions of advertising opportunities per second. This AI-based approach purported to offer highly accurate targeting by rapidly leveraging granular data, significantly reducing campaign waste, and enhancing the relevance of advertising placements. Unlike traditional methods that often rely on broader, less precise targeting, Trade Desk claimed that Kokai's seed-based approach would ensure that advertisements efficiently reach the most relevant audiences.

28.    Trade Desk operates in a very competitive and rapidly changing industry, competing with divisions of larger, well-established supply-side advertising networks like Google Ad Manager and Meta Audience Network, as well as other demand-side platforms like Amazon DSP that arrange advertising on internet-connected televisions ("CTV"). Over the course of the Class Period, analysts expressed concern about

Amazon taking market share from Trade Desk because of its expansive data ecosystems, superior resources, proprietary information about the consumers, and real-time data from over 315 million active users worldwide.

**Materially False and Misleading Statements Issued During the Class Period**

29.    The Class Period begins on May 9, 2024, the day after Trade Desk issued a press release announcing its financial results for the first quarter of 2024 (the "Q1 2024 Press Release").  In the Q1 2024 Press Release, Trade Desk reported revenue of $491 million, representing growth of 28 percent year-over-year. The Q1 2024 Press Release quoted Defendant Green as stating:

> With the continued strong growth of [internet-connected TVs], the growing ubiquity of [open-source consumer privacy protocol] UID2, new approaches to authentication, greater deployment of first-party data and retail data, and ***with significant AI advances in our Kokai platform, we are better positioned than ever to deliver premium value to advertisers and continue to gain market share***.

30.    In the Q1 2024 Press Release, Trade Desk touted the competitive advantages that it had against other CTV advertising platforms like Amazon DSP, which participates on both the demand-side and supply-side of advertising auctions:

> The Trade Desk offers the largest CTV inventory marketplace in the industry, giving advertisers unmatched access to premium content across major networks and ad-supported streaming services around the world. ***Because we do not compete in content or supply, we have built lasting relationships with premium publishers to help brands confidently engage their audiences and drive measurable results***.

31.    During the corresponding earnings call held that same day (the "Q1 2024 Earnings Call"), Defendant Green touted Kokai's growth prospects:

> The innovations in our Kokai platform will help our clients take advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the Open Internet and ***our ability to gain more than our fair share of the nearly $1 trillion advertising [total addressable market]***.

32.     During the Q1 2024 Earnings Call, Defendant Green stated, "*I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we are delivering to our clients with Kokai*."     Specifically, Defendant Green touted the innovations that led the Kokai platform to drive demand-side revenue:

> One of the major innovations in Kokai is the Sellers and Publishers 500 Plus. *This is a curated marketplace that represents the best of the Open Internet, the premium Internet, where consumers spend the majority of their time online. It's live sports events such as March Madness, where we saw a 200% increase in spend compared to a year ago*. It's the latest movies and hot TV shows, it's music and podcasts on platforms like Spotify, it's trusted journalism.

Defendant Green further stated that new Kokai updates would be rolled out to nearly all of its customers "over the next few quarters":

> As a reminder, last year on 06/06, we started shipping Kokai. This platform launch is different for us because 06/06 last year marked just the beginning, and we've been shipping new features ever since. *We are quickly approaching some of the biggest UX and product rollouts of Kokai that nearly all of our customers will begin to use and see benefits from over the next few quarters, including a game-changing AI-fueled forecasting tool*.

33.     Additionally, during the Q1 2024 Earnings Call, Defendant Schenkein reiterated the role of Kokai in propelling the Company's growth, stating, "All of our progress in areas such as CTV, Retail Media, Kokai and [security protocol] UID2 helped deliver another quarter of *consistently strong growth and profitability to start 2024*."

34.     During the Q1 2024 Earnings Call, Defendant Schenkein also stated that the Company was "executing" on Kokai as a long-term growth driver:

> In closing, we are encouraged about the momentum of our business. *We're executing on large long-term growth drivers, including* CTV, international expansion, retail media, *our recent platform upgrade in Kokai*, UID2, as well as the upcoming US election cycle.

35.     During the Q1 2024 Earnings Call, Defendant Green also underplayed the growing competitive threat from Amazon DSP, Amazon's competing ad placement platform. For example, in discussing the competitive threat from Amazon,

Defendant Green stated that, "***I actually don't think they're that competitive***" in response to an analyst's question about viewers increasingly watching walled-off advertisements on Amazon Prime:

> So I'd love to see them evolve. Actually, not too dissimilarly from what we've seen from Roku. To see them evolve to a place where they embrace the Open Internet, embrace those common currency, so that advertisers can bring their own data to bear, and then they would get higher CPMs, they could have a lighter ad load, they could have a better ad experience, and all of that would be good for Prime Video customers, but there's a lot that has to happen.

> Until that happens, ***I actually don't think they're that competitive. And I think all the other players have a much more competitive offering to the most premium advertisers, which is what television is really all about. And tell them, I think the premium supply doesn't have quite as much of a surplus as there could be if Amazon embrace that, and I think we're going to see it take a little while before we get there***.

36. Defendant Green further touted Trade Desk's competitive advantages:

> ***Advertisers want a competitive market with price discovery, because they want to own their own future. It is easier than ever for advertisers to understand who is delivering value at all points of the digital advertising supply chain***. And they will increasingly gravitate to those who are helping them make the most of every advertising dollar with transparency and objectivity.

> Of course, this is all made possible by our profitable business model, which generates significant cash flow, which in turn allows us to invest in the major platform upgrades that characterize Kokai.

> So while I believe 2024 will be remembered as a year of great tech-driven disruption in our industry, I also believe it is a year that The Trade Desk will continue to differentiate itself from its competitors and continue to outpace the market. ***As the industry races toward $1 trillion TAM, we are incredibly well-positioned to take more than our fair share***.

37. Two days later, on May 10, 2024, Trade Desk filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q touted the updates to the Kokai platform as enhancing its competitive position:

Our platform system applications are complex, multi-faceted and include applications that are highly customized in order to serve and support our clients, advertising inventory and data suppliers, as well as support our financial reporting obligations. ***We regularly make improvements to our platform to maintain and enhance our competitive position***.

38.    While the Q1 2024 10-Q discussed "superior competitive offerings" as a risk factor affecting Trade Desk's performance, Defendants downplayed the severity of the negative impacts of this factor on the Company's short- and long-term prospects, merely warning of risks that "may" or "could" materialize "if" certain aggravating conditions occurred:

If we fail to innovate or make the right investment decisions in our offerings and platform, we may fail to attract and retain advertisers and advertising agencies and our revenue and results of operations may decline.

Our industry is subject to rapid and frequent changes in technology and laws governing our activities, evolving client needs and expectations and the frequent introduction by our competitors of new and enhanced offerings. ***If new or existing competitors have more attractive offerings, we may lose clients or clients may decrease their use of our platform***. New client demands, ***superior competitive offerings*** or new industry standards could require us to make unanticipated and costly changes to our platform or business model. We must constantly make investment decisions regarding offerings and technology to meet client demand and evolving industry and legal standards. We may make bad decisions regarding these investments. ***Furthermore, even if we believe that our invest-ments improve upon our platform and offerings, such as updates to our various platform features and user interface, they may nevertheless fail to meet new or existing client expectations or preferences, which could result in decreased client adoption or use of our platform***.

This risk factor was false or misleading because competition from Amazon had already begun to affect the Company's revenue.   Therefore, this very risk had materialized during the Class Period.

39.    Appended as exhibits to the Q1 2024 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the Q1 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

40.    On May 17, 2024, Defendant Jacobson participated in the LUMA Partners' Digital Media Summit ("DMS by LUMA 2024 Conference").  During the DMS by LUMA 2024 Conference, Defendant Jacobson made the following remarks about the Kokai update:

> I mean even just in the past few weeks we've had announced expansions in our partnership with Disney with Roku with LG. There's so many of them that continue to lean in and embrace programmatic and it's because of the results that advertisers get.

> Of course we're working to continue to innovate that, so we talked about ***Kokai, which is the upgrade of our platform and one of the components there is something we call the sellers and Publishers 500 plus.  That's pulling together the best access of inventory across the open internet to make it easy for advertisers to buy and in a brand-suitable way that still transparently delivers performance***.

41.    During the DMS by LUMA 2024 Conference, Defendant Jacobson also made the following statements about the competitiveness of the Kokai platform:

> We believe in transparency. We believe in giving our advertisers choice, but we also recognize the value of machine learning or AI which is why we've pulled in the opportunity for advertisers to bring incredible first-party data assets to bear. ***We of course want to complement that with the amazing retail assets that we have available on the platform as well as other third-party offerings and then we want to make sure that we're enriching that with AI, so we do that through what we call Kokai*** because we recognize that we don't want to have the legacy approach of saying I'm going to select an audience provider based on whomever had the most interesting PowerPoint that came to my office last week or I'm going to scroll and click through and I'm going to hit anything that has the word fast food in it.

> You want machine learning to be put to work on your behalf to help select the right data assets based on what your campaign is trying to do to make sure you're advertising at the optimal price point for those impressions, to make sure

you understand who you're advertising to but there also needs to be transparency and accountability it can't just be don't worry I have this black box and out the other side I'll let you know how well I did which is why we provide event level data which is why we work with so many amazing third-party providers, which is why we give advertisers data themselves so they can do their own analysis or marry it with other assets they have. So to me I think that yes *machine learning or AI has a place but it can't replace transparency and trust I think that's at the epicenter of everything we do*.

42.    On August 8, 2024, after the markets closed, Trade Desk issued a press release announcing its financial results for the second quarter of 2024 (the "Q2 2024 Press Release"), reporting second quarter revenue of $585 million and 26% revenue growth year-over-year.    In the Q2 2024 Press Release, Defendant Green emphasized that as Kokai continues to roll out, the Company is "*intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data*."

43.    In the Q2 2024 Press Release, Defendant Green made the following remarks concerning Trade Desk customers' ramp-up of Kokai:

Q2 was another strong quarter for The Trade Desk, with revenue of $585 million, representing 26% year-over-year growth. We've made significant strides in CTV, retail media and identity, empowering the world's largest brands to buy premium media on the open internet with unprecedented agility and precision. *As Kokai ramps, we're intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data. With ongoing innovations in Kokai*, the wide-spread adoption of UID2, and the expanding use of retail data, *we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV*.

44.    In the Q2 2024 Press Release, Trade Desk also touted the competitive advantages that it had against other CTV advertising platforms like Amazon DSP, which participates on both the demand-site and supply-side of advertising auctions:

The Trade Desk offers the largest CTV inventory marketplace in the industry, giving advertisers unmatched access to premium content across major networks and ad-supported

streaming services around the world. ***Because we do not compete in content or supply, we have built lasting relationships with premium publishers to help brands confidently engage their audiences and drive measurable results***.

45.    During the corresponding earnings call held that same day (the "Q2 2024 Earnings Call"), Defendant Green touted Kokai's use case, stating:

In order to help advertisers think about efficacy in new ways and to help them take advantage of the premium open Internet where consumers are most leaned in, after years of development, we launched our most ambitious platform to date, Kokai. Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers.

46.    During Q2 2024 Earnings Call, Defendant Green made the following statements concerning the Kokai platform:

Our relationships with the world's leading brands and their agencies are only getting stronger. It's one of the key reasons we continue to ***significantly outperform the market*** and why I believe we'll continue to gain share in the years ahead.

And we are thrilled and thankful to be partnering with the world's most forward-thinking marketers as we bring that value to life. We believe we've aligned our interest with theirs, creating a very bright future for both of us. Let me bring my remarks to a close by summarizing what all of this means for us and why I believe ***The Trade Desk is positioned so well to capture more than our fair share of that $1 trillion TAM. We're in the midst of a period of tremendous change in our industry, change that's the result of macro market pressures as well as rapid innovation, such as Kokai***.

During the second quarter, we continued to invest in our team, our platform and our infrastructure to support sustained growth. Thanks to our careful management of operating expenses in recent years, ***we are well positioned to innovate our platform, invest in cutting edge technologies like AI, expand our teams and further distance ourselves from competitors***.

47.    During the Q2 2024 Earnings Call, regarding the Kokai rollout, Defendant Green further stated, "***I've been incredibly encouraged by the early results from Kokai[,]***" while highlighting that the "campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%[,]" and "[c]ost per acquisition has improved by about 27% as data elements per impression have gone up

by about 30%."  Defendant Green further explained that "***performance metrics have improved by about 25 percent, helping to unlock performance budgets on our platform for years to come***."

48.    Referencing his earlier remarks during the same call about "meeting with many [chief marketing officers]" ("CMOs") from global brands who are "putting a premium on the efficacy of marketing."  Defendant Green stated, "***Given everything I said about what CMOs today are trying to accomplish and the pressures that they are under, I firmly believe that we have met the moment with Kokai***."

49.    During the Q2 2024 Earnings Call, Defendant Green was asked about what allowed Trade Desk to outperform competitors:

> Q:  Congrats on another great quarter. Jeff, could you maybe provide your high-level thoughts on the current digital ad environment right now. And kind of going back to what you mentioned kind of at the start of the call, what's allowing Trade Desk to continue to so meaningfully outperform everyone else in gains here? Thank you.

> A: Thanks, Shyam. Really appreciate the question. So, first, let me just talk about our company before I talk about the macro environment. ***I don't know that I have ever been more proud of our team across the board, not just in our go-to-market teams, but of course, our engineering team, and throughout the entire company. I don't know that we've ever been firing on all cylinders in the way that we are right now***.

> And that has absolutely been essential in this environment, because we've never had more change, especially in CTV, in a three- to four-month period that we've had. All good things coming at us, just lots of opportunity, but responding to it all and adjusting to it all is something that I think our team has done really, really well. One thing that I do want to highlight at a macro level that I think makes us different than other players in the space is that we are not a destination, and we are not sell-side.

> So, often we get compared to other companies that are dependent on ads, but they are destinations, whether they are an app, or whether they're a mobile company, or whether they're a website. People are trying to go to those destinations, and then they have added inventory that they have sell in moments. We are not a destination, or a B2B company that represents buyers.

16

> So, there is a big difference right now between the sell-side and the buy-side. And we're seeing some changes on the sell-side in almost every category, but we're not on the sell-side, we're on the buy-side. And *as a result of that, I believe that The Trade Desk is in a stronger position than we have ever been before*.

50.     During the Q2 2024 Earnings Call, Defendant Schenkein made the following statement about Kokai as a key growth driver:

> In closing, we are extremely pleased with our strong performance in the second quarter and throughout the first half of the year. The opportunity ahead of us has never been more promising. We are positioned within a large and expanding market, supported by a business model that consistently delivers robust top line growth, significant profitability and strong cash flow.

> With **key growth drivers** such as CTV, retail media, international expansion, a strong identity strategy, and *a major product upgrade with Kokai, we remain confident and optimistic about our future as we navigate the second half of this year, and look forward to 2025 and beyond*.

51.     That same day, Trade Desk filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2024 (the "Q2 2024 10-Q").  The Q2 2024 10-Q touted the updates to the Kokai platform as enhancing its competitive position:

> Our platform system applications are complex, multi-faceted and include applications that are highly customized in order to serve and support our clients, advertising inventory and data suppliers, as well as support our financial reporting obligations. *We regularly make improvements to our platform to maintain and enhance our competitive position*.

52.     Appended as exhibits to the Q2 2024 10-Q were substantively the same risk factors and SOX certifications signed by the Individual Defendants as referenced in ¶¶ 38-39, *supra*.  These risk factors were false or misleading because competition from Amazon had already begun to affect the Company's revenue.  Therefore, these very risks had materialized during the Class Period.

53.     On November 7, 2024, after the markets closed, Trade Desk issued a press release announcing its financial results for the third quarter of 2024 (the "Q3 2024 Press Release").  Trade Desk reported third quarter revenue of $628 million and

provided fourth quarter revenue guidance of $756 million.  In the Q3 2024 Press Release, Defendant Green stated, "[T]he performance improvements that our clients are seeing with Kokai—our largest platform upgrade to date—showcase the value of audience-driven, AI-enabled innovation."

54.    During the corresponding earnings call held that same day (the "Q3 2024 Earnings Call"), Defendant Green once again assured investors that "*[w]e are already seeing the results of Kokai performance today*, but we're just getting started." Defendant Schenkein further touted that "*[k]ey investment initiatives, including performance advancements in our Kokai platform . . . are not only strengthening our foundation, but position us for durable growth in 2025 and beyond*."

55.    During the question-and-answer portion of the call, Defendant Green was asked about Kokai by an RBC Capital analyst:

> Q: What type of work does it take to help CMOs and the users understand the metrics coming out of Kokai but also to kind of gain trust around them? I know that's been a challenge in some other walled garden platforms, so people trusting the attribution data.

> A:  I really appreciate the question because I think this is one of the more nuanced ways that we have just so much opportunity in front of us. . . . *But the state of measurement is that walled gardens have essentially been grading their own homework for many, many years. And one of the things that they've done really well is convinced people to use their own metrics and kept things quite simple. But at times, that's been really difficult for some of the biggest brands in the world because they'll be told by a walled garden, we help you sell 101 toothbrushes, when the company actually only sold 100 toothbrushes total*.

56.    Defendant Green further touted the growing adoption of Kokai:

> I'm incredibly proud of our performance in the third quarter, and we are currently firing on all cylinders, whether that's what's happening in CTV, it being both our largest channel and our fastest growing which those two themes don't usually go hand in hand, or the amazing efforts in Kokai.

> *It started the year as an engineering effort, and it since turned into both an engineering effort as well as our sales and client services teams getting that adopted. The adoption has been phenomenal*. The product is the best that we've

ever shipped. So, a lot going for us in that. UID2 has become
the primary currency of identity in the open Internet.

57.     That same day, Trade Desk filed a quarterly report on Form 10-Q with the
SEC, reporting the Company's financial and operating results for the quarter ended
September 30, 2024 (the "Q3 2024 10-Q").  The Q3 2024 10-Q touted the updates to
the Kokai platform as enhancing its competitive position:

> Our platform system applications are complex, multi-faceted
> and include applications that are highly customized in order
> to serve and support our clients, advertising inventory and
> data suppliers, as well as support our financial reporting
> obligations. ***We regularly make improvements to our
> platform to maintain and enhance our competitive position***.

58.     Appended as exhibits to the Q3 2024 10-Q were substantively the same
risk factors and SOX certifications signed by the Individual Defendants as referenced
in ¶¶ 38-39, *supra*.  These risk factors were false or misleading because competition
from Amazon had already begun to affect the Company's revenue.  Therefore, these
very risks had materialized during the Class Period.

59.     Defendants' statements referenced in ¶¶ 29-58 were materially false and
misleading because they failed to disclose that: (i) Trade Desk was experiencing
significant performance issues with the Kokai platform that were negatively impacting
customer adoption; (ii) Trade Desk was deliberately slowing the pace of its Kokai
rollout to maximize short-term profits; (iii) competition from Amazon and other
competing platforms was taking substantial market share away from Trade Desk; and
(iv) Trade Desk's engineering and sales teams were not adequately structured to
support the Kokai rollout and fend off mounting competition.

**The Truth Is Revealed to Investors**

60.     The truth about the Company's unsuccessful Kokai rollout and its loss of
market share to competing platforms was revealed to the market on  February  12,
2025.  On that date, Trade Desk issued a press release announcing its financial results
for the fourth quarter and full year of 2024, ended December 31, 2024.   In the press
release, Trade Desk reported fourth quarter revenue of $741 million—below the

19

Company's previously issued guidance of $756 million and analysts' consensus estimate of $759.8 million. Additionally, Trade Desk provided revenue guidance of at least $575 million for the first quarter of 2025, missing analysts' estimates of $581.5 million.

61.    In the press release, Defendant Green stated, "[W]e are disappointed that we fell short of our own expectation in the fourth quarter." Moreover, Defendant Green explained that the Company "undertook a reorganization to accelerate opportunities across CTV, retail media, identity, supply chain optimization, and audio[,] while forging ahead with innovations like Kokai."

62.    During the corresponding earnings call held that same day (the "Q4 2024 Earnings Call"), Defendant Green disclosed that Trade Desk has yet to onboard all of its clients onto Kokai, stating:

> We'll move 100% of our clients to Kokai this year. Now the majority already have. But today, we're maintaining 2 systems, Solimar and Kokai. This slows us down. Kokai is more effective in almost every way.

63.    During the Q4 2024 Earnings Call, Defendant Green also made the following remarks about the Company's reorganization:

> If this were a sporting event, we'd still have a championship caliber team. But in this particular game, we turned over the ball too many times. That said, we see a larger and faster growing market than we originally expected, which is why we have been making changes and will continue to do so. Simply put, as you've seen before, as companies grow and become increasingly complex, they need recalibration to unlock new opportunities. We are recalibrating our larger company for an even stronger future.
>
> In that effort, I want to highlight four major changes we've made at The Trade Desk in the last few months and some related initiatives that accompany them. First, we did the largest reorganization in company history in December. While we often make structural changes at the end of the year to improve our business, this was bigger than usual. For most people in the company, we provided a much clearer view of their roles and responsibilities, and for most, that also meant a change in reporting structure. Additionally, we streamlined client facing teams, reducing complexity, and clarifying responsibilities. Some team focus on brands, while others focus on agencies. Our commitment to agencies remains strong, but we are also expanding brand direct relationships,

particularly through joint business plans, which grow 50% faster than the rest of our business.

Second, beyond structural improvements, we placed a stronger emphasis on internal effectiveness and scalability. Over the past two months, leadership has spent more time discussing operational improvements than at any other point in our history. While we've historically been focused on external opportunities, we understand that this moment requires us to scale our internal operations and continue hiring senior talent to support long-term growth. These changes position us to execute at a higher level and capitalize on the expanding market opportunities ahead.

Third, we have increased our resource allocation on brands. A broader shift is occurring in the industry. Advertisers are becoming more strategic and data driven in their media buying decisions, and that's great for us. While this shift has caused short-term fluctuations, it's ultimately aligned with our long-term strengths. We recognize that advertising will ebb and flow. At the same time, as advertisers prioritize precision and efficacy, our programmatic data-driven plat-form is becoming more essential than ever to brands and agencies.

This is evident in the growing number of joint business plans or JBPs that we've secured with over 100 of the world's leading brands, many of them in the second half of last year. JBPs provide a structured, mutually beneficial framework for brands, their agencies and The Trade Desk, and they reinforce the long-term value we bring to the industry. They also historically grow faster than the rest of our business.

Fourth, we revamped our product development process, shifting back to smaller agile teams that release updates weekly instead of drifting towards waterfall methods, which are less conducive to our fast-paced and changing industry. Our engineering team is now divided into nearly 100 scrum teams with a system to more easily ship and collaborate with the business team on what has shipped and what will ship and when. I expect this to continue to accelerate Kokai enhance-ments and complete the transition of 100% of our clients from Solimar to Kokai during this calendar year.

64.    During that same call, in response to a Cannonball Research analyst expressing concern regarding "issues with Kokai rollout pace," Defendant Green plainly stated, "you're right, that Kokai rolled out slower than we anticipated." However, while addressing that same analyst's question, Defendant Green later explained that "in some cases, the slower Kokai rollout was deliberate."

65.     Analysts swiftly reacted to the disappointing pace of the Kokai rollout. For example, in a report titled "Debacle Leads To Doghouse," Wedbush Securities analysts cut their price targets and reported:

> Management attributed the miss in 4Q to a series of several, small execution mistakes (including a delayed rollout of the company's Kokai platform) while Q1 guidance signals management has decided to more aggressively invest in strategic initiatives this year.

66.     Additionally, in a report titled "Too Many Turnovers, On To The Next," Cantor Fitzgerald analysts also cut their price targets and noted that "slower rollout of Kokai (missed 50% EOY adoption goal) also weighed on 4Q revs."

67.     Moreover, William Blair analysts published a report in response to the disclosure, highlighting the fact that "the company is maintaining two systems: Kokai and Solimar.  While the majority of clients are already exclusively using Kokai, select clients are still utilizing Solimar but plan to shift by the end of 2025."

68.     Analysts were also concerned about Trade Desk's mounting competition. For example, analysts at RBC Capital Markets stated that the "results likely build on investor competitive concerns."   Wedbush Securities analysts noted that "the underperformance in the quarter amplifies a number of recent debates, including the strength of the company's competitive position."  Similarly, analysts at Needham & Co. stated that they had conducted channel checks suggesting that competing DSPs "have been taking business away from TTD, starting in 2H24."

69.     On this news, the price of Trade Desk Class A common stock dropped $40.31 per share, or more than 32%, from a closing price of $122.23 per share on February 12, 2025, to a closing price of $81.92 per share on February 13, 2025.

70.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

71.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the documents and public statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Trade Desk, and their control over and/or receipt and/or modification of Trade Desk's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

72.    Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complexity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

73.    The Individual Defendants, because of their positions with Trade Desk, controlled the contents of Trade Desk's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Trade Desk's corporate statements and is, therefore responsible and liable for the representations contained therein.

**LOSS CAUSATION**

74.     During the Class Period, as detailed herein, Trade Desk and the Individual Defendants made false and misleading statements and omissions, and engaged in a scheme to deceive the market.  These false and misleading statements and omissions artificially inflated the price of Trade Desk common stock and operated as a fraud or deceit on the Class (as defined below).   Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Trade Desk common stock fell significantly.  As a result of their purchases of Trade Desk common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

75.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Trade Desk common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of January 31, 2025, 452,425,879 shares of Trade Desk's Class A common stock were outstanding, owned by thousands of investors.  Throughout the Class Period, Trade Desk common stock were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records

maintained by Trade Desk or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants' statements and/or actions mispresented material facts;

(c)    Whether Defendants' statements and/or actions omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

(e)    Whether Defendants' misconduct impacted the price of Trade Desk securities;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damages sustained by Class members and the appropriate measure of damages.

78.    Plaintiff's claims are typical of those of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

80.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

81.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Trade Desk who knew that the statement was false when made.

## PRESUMPTION OF RELIANCE

82.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.  At all relevant times, the market for Trade Desk common stock was an efficient market for, among other things, the following reasons:

(a)    Trade Desk common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

(b)    As a regulated issuer, Trade Desk filed periodic public reports with the SEC and NASDAQ;

(c)    Trade Desk regularly and publicly communicated with investors via established market communication mechanisms, including through regular

26

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Trade Desk was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s) and which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

83.    As a result of the foregoing, the market for Trade Desk common stock promptly digested current information regarding Trade Desk from publicly available sources and reflected such information in the price of Trade Desk common stock. Under these circumstances, all purchasers of Trade Desk common stock during the Class Period suffered similar injury through their purchase of Trade Desk common stock at artificially inflated prices and the presumption of reliance under the fraud-on-the-market doctrine applies.

84.    Further, at all relevant times, Plaintiff and other Class members relied on Defendants to disclose material information as required by law.  Plaintiff and other Class members would not have purchased or otherwise acquired Trade Desk common stock at artificially inflated prices if Defendants had disclosed all material information as required by law.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

85.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

86.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Trade Desk common stock during the Class Period.

89.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Trade Desk common stock.  Plaintiff and the Class would not have purchased Trade Desk common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

90.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Trade Desk common stock during the Class Period.

91.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants)

92.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1-91 as if fully set forth herein.

93.    The Individual Defendants acted as controlling persons of Trade Desk within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Trade Desk, the Individual Defendants had the power and ability to control the actions of Trade Desk and its employees.  By reason of such conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: March 5, 2025          Respectfully submitted,

/s/ Lucas E. Gilmore

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1     HAGENS BERMAN SOBOL SHAPIRO LLP
2     Reed R. Kathrein (Bar. No. 139304)
      reed@hbsslaw.com
3     Lucas E. Gilmore (Bar No. 250893)
      lucasg@hbsslaw.com
4     715 Hearst Avenue, Suite 300
      Berkeley, CA 94710
5     Telephone: (510) 725-3000
      Facsimile: (510) 725-3001
6
7     HAGENS BERMAN SOBOL SHAPIRO LLP
      Christopher R. Pitoun (Bar. No. 290235)
8     christopherp@hbsslaw.com
      301 North Lake Avenue
9     Pasadena, CA 91101
      Telephone: (213) 330-7150
10    Facsimile: (213) 330-7152
11
      *Liaison Counsel for Plaintiff*
12
13    LABATON KELLER SUCHAROW LLP
      Francis P. McConville (*pro hac vice*
14    forthcoming)
      fmcconville@labaton.com
15    140 Broadway
      New York, NY 10005
16    Telephone: (212) 907-0700
      Facsimile: (212) 818-0477
17
18
      *Counsel for Plaintiff and the Proposed Class*
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION

I, Daniel J. Greene, as Chief Administrative Officer of New England Teamsters Pension Fund ("New England Teamsters"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of New England Teamsters. I have reviewed a complaint prepared against The Trade Desk, inc. ("Trade Desk") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.    New England Teamsters did not purchase Trade Desk Class A common stock at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    New England Teamsters is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. New England Teamsters fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.    New England Teamsters' transactions in Trade Desk Class A common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.    New England Teamsters sought to serve as a lead plaintiff or representative party in the following class actions filed under the federal securities laws during the last three years:

> *Erie County Employees' Retirement System v. Cutera, Inc.*, No. 5:23-cv-02560 (N.D. Cal.)
> *New England Teamsters Pension Fund v. RTX Corporation*, No. 3:23-cv-1274 (D. Conn.)
> *In re Agilon Health, Inc. Securities Litigation*, No. 1:24-cv-0297 (W.D. Tex.)

6.    Beyond its pro rata share of any recovery, New England Teamsters will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 27th day of February, 2025.

Daniel J. Greene
Chief Administrative Officer
New England Teamsters Pension Fund

## EXHIBIT A

## TRANSACTIONS IN THE TRADE DESK, INC. CLASS A COMMON STOCK

| Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|
| Sales | 05/28/24 | (300) | $95.09 | $28,527 |
| Sales | 07/29/24 | (500) | $92.21 | $46,105 |
| Purchases | 09/04/24 | 316 | $101.35 | ($32,027) |
| Purchases | 09/30/24 | 400 | $109.65 | ($43,860) |
| Purchases | 10/25/24 | 200 | $119.47 | ($23,894) |
| Purchases | 10/25/24 | 200 | $119.47 | ($23,894) |
| Purchases | 11/27/24 | 200 | $128.15 | ($25,630) |
| Purchases | 01/03/25 | 177 | $121.84 | ($21,566) |
| Purchases | 01/30/25 | 200 | $118.94 | ($23,788) |
| Closing Balance | 02/12/25 | 5,161 | | |